**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **CLARE SABIO** | ) | |
| Plaintiff, | ) | **Civil Action No.** 1:25-CV-00593 (PTG/IDD) |
| v. | ) | |
| **ARLINGTON COUNTY BOARD OF SUPERVISORS** | ) | |
| Defendant. | ) | |

**SECOND AMENDED COMPLAINT**
(Sex and Disability Discrimination and Retaliation)

## INTRODUCTION

1. Plaintiff Clare Sabio brings this action against Arlington County Board of Supervisors to remedy employment discrimination against her on the basis of her sex (female) and retaliation for complaints of sex harassment, in violation of Title VII of the Civil Rights Act of 1964, 42U.S.C. §§ 2000e *et seq.* and on the basis of her disability (PTSD) and retaliation for requests for reasonable accommodation, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

## JURISDICTION

2. This Court has jurisdiction over this cause of action pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 12117(a), and 42 U.S.C. § 2000e-5(f).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

3. Plaintiff has exhausted her administrative remedies by filing a charge of discrimination with the U.S. Equal Employment Opportunity Commission against Arlington

County on December 5, 2023. A right to sue notice was issued on February 6, 2025, which is fewer than 90 days before the filing of this Complaint.

**VENUE**

4. Venue is proper in the Eastern District of Virginia as Plaintiff was employed by Defendant Arlington County in this judicial district and the acts complained of occurred in this judicial district.

**PARTIES**

5. Clare Sabio is a legal permanent resident of the United States.

6. Defendant Arlington County Board of Supervisors is part of the government of the Commonwealth of Virginia or a political subdivision of the Commonwealth of Virginia. It has employed more than 400 people in each of the last 20 months.

**FACTS**

***Ms. Sabio's Experience and Background.***

7. Ms. Sabio alleges that Respondent, the Arlington County Board of Supervisors (ACBS or the "Department"), violated Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act ("ADA"), when it subjected her to a hostile work environment based on her sex and in retaliation for complaints of sex discrimination, discrimination based on her disability, denial of her reasonable accommodation request.

8. Ms. Sabio was employed as a firefighter by Defendant in various capacities from 2007 until June 2024.

***Defendant has known about pervasive sexual harassment in its Fire Department since 2006, but has not taken steps to address it.***

9. During her time with the Department, Ms. Sabio has experienced sexual

harassment and a pervasive culture of tolerance towards sexual harassment and other discriminatory behavior, which the Department has shown little interest in addressing.

10. These problems are longstanding. In 2006, the Department performed a culture assessment that showed pervasive, unaccountable sexual harassment that remains to this day.

11. The Department has had a sexually offensive practice called the "Loser Lap" since at least 2007. During a "Loser Lap" fire crews deliberately take a slow lap around the Clarendon and Shirlington neighborhoods during nice weather to look at the women. The crews make inappropriate, suggestive remarks about women they see during this drive, even if women are in their fire crews.

12. The practice of the "Loser Lap" continues to this day, even after the Defendant was made aware of the sexist practice. The only difference now is that the men make sarcastic remarks (after the sexist remarks) about how they should not say that anymore because of the women who complained.

13. A former Chief in the Department, Nathan Miller, frequently yelled out "Vooooooot!" whenever he spotted a woman he found attractive and has been doing so since at least 2007. This behavior is so regular and accepted that other male members often participate, even to this day. Ms. Sabio heard this phrase multiple times from Captain Santini, a former crew member of Chief Miller, throughout his time as her Recruit Class Instructor in 2007. She has also frequently heard it from Captain Philip Tessier, another former crew member of Chief Miller. Both continue to use the phrase to this day.

14. In or about 2010, at her initiative, the Department began sponsoring a female-only youth camp for free to the community, with the goal of getting teenage girls interested in fire service. They named the camp "Camp Heat." However, the Department barely supported it, and

many of the men in the Department pushed back on its existence altogether, stating that an all-girls camp was unfair and mocking the camp as "Girls in Heat." The Department eventually gave in to these men and made the camp for all genders. The camp still occurs, but all of the founding members have since stepped away from involvement, feeling that they cannot, in good conscience, based on the current environment, recommend the DEFENDANT to any new females.

15. There is a common call and response "joke" in the Department every time there is cake. Someone will ask "What happens when we are all out of cake?" and the response is, "When we run out of cake, there is cock!" This happens every time they have cake.

16. As recently as around May of 2024, two Lieutenants at Ms. Sabio's station said the "joke" in her presence and were warned by the Captain present that "you can't say that anymore or you'll end up being investigated." The officers then laughed and responded "Oh, that's right, we can't have fun anymore ."

17. There are constant derogatory comments from male firefighters about female firefighters' driving ability.

18. At the end of September 2016, Firefighter/EMT-P Tracie Anderson sent a letter to many of the women in the Department asking them to speak up and meet with a couple of chiefs, Assistant Fire Chief (AFC) Joseph Reshetar and Deputy Fire Chief (DFC) Stuart Insley, about ways to improve the environment for women. Firefighter Anderson sent follow-ups to Chiefs Reshetar and Insley, suggesting training on sexual harassment for the Department.

19. In 2019, Firefighter Michael Houseworth sexually harassed Casey Cleaver and Keri Sachtleben. The Department had ignored a report of harassment while Houseworth was a

probationary firefighter and promoted him to a full firefighter position, without corrective action for the harassment – emboldening him to continue to harass women in the Department.

20. The Department mandates that women wear Department-issued uniforms and athletic attire, even though it only provides said attire in male cut and sizes. Women are prohibited from wearing leggings, which come cut for women's bodies and in women's sizes. Women are told that leggings and other women-specific athletic attire is "too sexualized."

21. While serving as an Academy instructor, Ms. Sabio was mandated to lead physical fitness training wearing the Department-issued Men's basketball shorts, despite the fact that they were too big to stay up properly and made of see-through mesh material. This made Ms. Sabio deeply uncomfortable to be at the front of the almost entirely male class. Several female instructors reported this discomfort to the Academy Captain, who refused to permit any alternative.

22. Meanwhile, the Department allows male firefighters to work out in cut-off shirts and even shirtless. As recently as July 2025, a male firefighter, Strums, has posted numerous shirtless workout videos to social media platforms, clearly filmed in the Fire Station apparatus bay, and with offensive captions or comments added against women. In at least one video, another male firefighter is visible in the background, so it was clearly known to others that this was happening and is a clear violation of multiple fire department conduct policies.

23. While working at a CPAT (Candidate Physical Agility Test) practice, which took place at Fairfax County Fire Department's facility, and hosted multiple potential Department hires, Battalion Chief Eversburg walked into the facility with a banana in his shorts, thrusting it at Ms. Sabio and other female firefighters present, asking "Is this a banana or am I just pleased to see you?" Other Officers present did not call out the behavior as

inappropriate and laughed along with the Chief, who has been known for frequent inappropriate behavior, going back decades.

***Defendant has no plan or policy to prevent sexual harassment.***

24. To date, there is no formal plan for sexual harassment training and no reporting mechanism for complaints. Aside from her employee orientation in 2007, there has been only one Department-wide anti-harassment training, which occurred ten years after Sabio's orientation, in 2017, after repeated requests.

25. The one-time training was conducted via the online platform Vector Solutions. The training consisted of a self-guided slide deck issued by the Office of the County Attorney. It was not part of a series, lacked interactivity, and did not involve any discussion, instruction, or assessment. In fact, individuals were only required to click a link and check a box indicating they had reviewed the material – regardless of whether they actually read or understood it. An employee could easily click through the training without reading a thing. The format and implementation of the training were formulaic and ineffective.

26. Before posting this training, Chief Gowen had sent it to several female members of the Department, including Ms. Sabio, for review. All reviewers reported back that the training was woefully inadequate and again requested for interactive, comprehensive sexual harassment training specific to the Fire Department's unique work environment. They also asked that the training be conducted at least annually.

27. Chief Gowen responded that in-person training would follow, and he proceeded to post the training as is. No such follow-up training ever occurred.

***Defendant allows medic to continue examining female firefighters for two years after learning he groped one female firefighter and harassed another during medical exams.***

28. In or around August and September 2021, an exercise physiologist, Aaron Middleton, contracted to conduct medical exams of firefighters for the Defendant, groped a female firefighter during a medical exam. Even after this report, the Defendant continued to contract with Middleton to conduct medical exams of its employees.

29. In 2022, Ms. Sabio was if she would prefer a female technician to conduct her exam but was not told that the male technician conducting exams had groped a female coworker. There was no mention of any potential for sexual harassment during the physicals.

30. The firefighter reported this incident to her chain-of-command, but they did not remove that physiologist from medical examinations. Middleton then harassed another female firefighter in October 2021. After this second woman reported her incident, the Department did not report the individual or seek discipline.

31. Defendant's so-called protection for female firefighters was to allow them to request medical exams be performed by a female – without telling them that a male examiner groped and harassed other women. Defendant continued to allow the groper to examine female firefighters until August 2023.

***Defendant failed to prevent Sabio and other women from online stalking and harassment, only blocking the online harasser from County servers after he identified and harassed male firefighters.***

32. Ms. Sabio was the victim of stalking at the Department in 2009 and then again in 2023. In 2009, she received anonymous Facebook messages and text messages. These messages were harassing and based on her sex, words to the effect of, "you don't belong in the department," and "you're just here to hook up with guys." These messages let her know that the

person was watching her and caused her anxiety.

33. Ms. Sabio was also harassed by an anonymous source in 2023. On July 28, 2023, she received an anonymous email from "J" using the email address rescuechallengebigtime@mailfence.com which read:

> Does Nick [Sabio's husband] know you are having an affair with John Trail? That's fucked up.

34. This sexist accusation was false and made Ms. Sabio feel that she was being watched at work. Ms. Sabio is part of the technical rescue team, from which the term "Rescue Challenge" originates, and John Trail is a member of her immediate crew. Ms. Sabio felt anxious and unsafe and did not know who to trust, even among her immediate crew members. Ms. Sabio reported the email to her Captain (Nicolas Calderon), who is her first line supervisor, but the Defendant took no action to ensure her safety or investigate the identity of the sender.

35. Several other female firefighters have received similar anonymous emails falsely accusing them of having affairs and making sexually explicit advances. When Firefighter Casey Cleaver expressed that she did not want to answer her male coworkers questions about her personal life, Matthew White, to identify the anonymous emailer, he told her "You can go get raped then and no one will care."

36. On July 31, 2023, Ms. Sabio received another email titled "The poop or scoop," from paratechwizards@protonmail.com. The term "paratech" is also related to technical rescue. Other members of the Department also received this email.

37. The email said that "Arlington is like a real-life episode of Chicago Fire with all the drama going on" and proceeded to reiterate the accusation that she was having an affair with John Trail. The email also contained additional inflammatory accusations concerning alleged

drug use, affairs, and sexual impropriety about other members of the Department.

38. Ms. Sabio again reported this email to her first level supervisor (Captain Nicolas Calderon) and also her chain of command: Battalion Chief Norman Clark, and Deputy Chief John Snider. Again, Defendant did nothing.

39. On August 8, 2023, Ms. Sabio sent an official memorandum to Deputy Chief Amanda Reeves, complaining about the misogynistic messages.

40. Ms. Sabio's chain of command took no action to get these emails to stop until the emailer started mentioning men. This was despite it being clear that the e-mailer is a member of the Department, as he/they include identifying details.

***Defendant denied Sabio remote work and failed to prevent, correct, or protect her from detrimental harassment.***

41. Because of the emails and lack of action by the Department, Ms. Sabio began taking sick leave to avoid going to work. She feared the stalking was happening again.

42. In an August 8, 2023, memorandum to Chief Reeves, copied to Captain Calderon, Ms. Sabio provided screen shots of the misogynistic messages, requested an update on any investigation into the harassment, and requested administrative leave with pay pursuant to County Administrative Regulation 2.7, Chapter 8, Subsection 14 ("Administrative Leave"). 14.1.2, which states:

> in circumstances where an employee must be removed from duty through no fault of their own, Department Director may place the employee on Administrative Leave with pay.

43. Subsection 14.2.1 of the Regulation states that Administrative Leave will be used "when it is not practical . . . to temporarily assign the employee to other duties where detrimental conditions will not exist."

44. Anonymous harassing emails are a "detrimental condition" that were not Ms. Sabio's fault. Ms. Sabio requested administrative leave because there was no way to reassign her where the detrimental condition did not exist ---unless Defendant caught the perpetrator.

45. Chief Reeves denied Sabio's request for administrative leave with pay on August 11, 2023. At that point, Ms. Sabio had used 70.84 hours of sick leave to protect herself from the harmful environment.

46. Chief Reeves suggested that Sabio could request a station and/or shift transfer. This would not protect her from the continued harassment because they did not know whether the anonymous stalker could continue to watch her at a new duty location or on a different shift.

47. Ms. Sabio was denied remote work even though the Department permitted firefighters to work in remote positions in the past.

48. For example, the Fire Department assigned Jennifer Garno to work remotely for more than eight years. Garno was a Firefighter/Paramedic who never complained of sex discrimination and did not have a disability,

49. Similarly, Ron Woods, a male Firefighter/EMT, was allowed to be off shift work for several months after he injured his back.

50. Indeed, Ms. Sabio worked remotely assigned as the EMS Education Coordinator for two and a half years.

51. Ms. Sabio continued to hold the position of Firefighter/Paramedic while performing the duties of the EMS Education Coordinator position.

52. The EMS Education Coordinator tracks the entire Department's EMS certifications, as well as training course creation, supports the Medical Director, liaises with VA

State on all EMS matters etc. Ms. Sabio often performed the position remotely, and exclusively remotely during the pandemic.

53. Furthermore, the position of EMS Education Specialist, the same position that Ms. Sabio had performed from 2018-2021, was held by someone without the required VA State certification.

54. The VA State EMS office requires that the person responsible for this is a VA Certified EMS Education Coordinator.

55. It takes two years to become certified for this position.

56. Ms. Sabio was, and is, certified by the state to perform in this position.

57. At the time Ms. Sabio requested remote work, there was nobody in the EMS office certified to do this work.

58. When Ms. Sabio held the EMS Coordinator position in the past, Defendant awarded her as EMS Provider of the Year (2020).

59. The Northern Virginia EMS Council commended her as an "Outstanding Prehospital Educator" for being able to pivot to a virtual platform and maintain the Department's high pass rates for initial EMS certifications.

60. The system was in disarray, which caused one of Defendant's EMTs to lose his certification and have to fully recertify as an EMT.

61. Chief Reeves provided no justification for refusing to assign Ms. Sabio to this remote position or any other.

62. Reeves also "offered" to let her use up her earned leave or leave without pay. Ms. Sabio did not think she should be deprived of pay when she had done nothing wrong.

63. Chief Reeves did not say the Department would try to identify the anonymous

emailer.

64. On August 12, 2023, Ms. Sabio joined a private group on their Microsoft Teams called "Women Centric issues," where several other female firefighters at the department expressed their concerns and fears over what was going on. Ms. Sabio learned that her experience of harassment and lack of any action by the Department was not unique.

***Department Failed to Accommodate Ms. Sabio's PTSD.***

65. On August 13, 2023, Ms. Sabio requested a light duty remote work option as reasonable accommodation for her anxiety and depression.

66. In her email to management, Sabio noted that the harassing emails caused her to suffer "anxiety, panic attacks, nightmares, depression, insomnia and a complete inability to focus."

67. On August 14, 2023, Ms. Sabio's psychologist diagnosed her with post-traumatic stress disorder (PTSD) due to the anonymous emails and the libelous accusations.

68. Ms. Sabio provided her psychologist's notes to Defendant on August 16, 2023.

69. On August 13, 2023, Ms. Sabio emailed her chain of command requesting their support and advocacy for her request for administrative leave with pay.

70. The Department has a policy of allowing employees to work remotely during times of temporary disability.

71. On August 16, 2023, the Department's Deputy Chief of Operations emailed Ms.

72. Sabio that the Department was still denying her request for administrative leave with pay.

73. Ms. Sabio also requested administrative leave with pay because of the

anonymous stalking and harassment triggered her PTSD. Defendant denied this remedy and instead offered "alternative" accommodations that would have tremendously disrupted her personal and professional life while not protecting her from whatever coworker was stalking her.

***Increasingly aggressive threats following denial of protection.***

74. On August 14, 2023, Ms. Sabio received an alarming email from her stalker. The email made clear that someone in management had told the stalker that she had complained about his harassment. The email began, "You went and told the Chiefs!" and called Ms. Sabio and her fellow firefighters a "bunch of cry-babies" for bringing their concerns to the chiefs. Then, the emailer threatened to escalate his abuse upon further complaints. The tone of the email was significantly angrier and more threatening, which increased her fears.

75. The Department never investigated how this abusive stalker learned that Ms. Sabio and her colleagues complained about the harassment.

76. The August 14 email was from "rescuejacksoff" using the email address rescuejacksoff@protonmail.com and was titled "crying??"

77. Ms. Sabio was terrified because she did not know who this was, and he obviously had some connection with her management (or possibly was a member of her chain of command). Because of these fears, Ms. Sabio requested that the Department remove her contact information from the Telestaff, the directory available to all officers and Chiefs within the Department and make it only available to Fire Department personnel responsible for payroll. The Department granted Ms. Sabio a similar request when she was a victim of stalking in 2009, reducing access from every Fire Department member to just Officers and Chiefs at that time.

78. In retaliation for her complaints of sexual harassment, the Department refused to

reduce access to her personal information from Telestaff, leaving it accessible to Chiefs and certain other officers, thus enabling her stalker to have continued access to her whereabouts.

***Female firefighters meet with Chiefs to voice opposition to sexual harassment.***

79. On August 16, 2023, Chief Reeves called a meeting that a majority of the women named in the anonymous emails attended. In that meeting, Chief Reeves detailed the police's ongoing investigation but said that progress was slow.

80. The Chiefs then opened the door to the attendees, and nearly every one of the women present discussed instances of harassment they had experienced as well as the Department's total lack of interest in doing anything about it.

81. The Chiefs in attendance expressed surprise at hearing this, as though they knew nothing about it before the meeting. They claimed that they had received "very little" documentation from their predecessors.

82. While the meeting left Ms. Sabio with some hope that things would change, later that day, Chief Reeves called her and told her that the Department would not approve her request for remote work.

83. Fire Department offers woefully ineffective ideas for protecting Ms. Sabio.

84. Chief Reeves ordered Ms. Sabio to show up at the Fire Chief's Office on the following Monday for a Monday through Friday desk work assignment. She told Ms. Sabio that she would "hide [her] in a cubicle where [she] would not have to interact with people."

85. The Department's assignment to desk duty did nothing to protect Ms. Sabio from being watched and possibly approached or attacked by the anonymous emailer. The anonymous e-mailer remained at large, and Ms. Sabio feared that he could be watching her on the alternate assignment and even be a member of her management team given his knowledge that she

complained.

86. A day work position would disrupt Ms. Sabio's home life, including existing medical appointments, and would interfere with her department-approved part-time job. Ms. Sabio relied on income from a part-time job because she could not work overtime due to her fears.

87. Ms. Sabio explained all of this to Chief Reeves and told her that she would be continuing to take her sick leave, as the Department had not identified the anonymous stalker or his connection to the Chiefs.

88. Department denies Sabio's worker's compensation.

89. On August 17, 2023, Captain Shupe filed a claim for Worker's Compensation for her work-related disability and placed Ms. Sabio on preliminary disability leave immediately.

90. However, the County denied Ms. Sabio disability leave, stating that disability does not "cover conflicts between co-workers" and that her PTSD must be a "sudden shock or fright" to qualify. The Department converted her paid disability leave to sick leave, which she ran out of in November 2023.

91. Sabio Joins Letter Advising County Board of Pervasive Sex Discrimination.

92. Shortly after the August 14, 2023, email harassment – the first one addressed and sent to men -- the Department blocked further emails from protonmail.com from being received by County email addresses. The Department only took this action after the anonymous emails had started naming and shaming men.

93. Between August 15 and September 13, 2023, the women of the Department held several meetings to discuss the hostile work environment they faced.

94. On August 23-28, Ms. Sabio assisted several other women in drafting a letter to

the County Board addressing the ongoing culture of harassment and discrimination that the Department continuously failed to address. The group of female firefighters and officers sent the letter to the County Board on August 28, 2023.

95. They bypassed internal department channels due to their deep distrust of the Department's ability to self-correct.

96. On August 31, 2023, Arlington County Board Chair Christian Dorsey responded to their letter and admitted that the Department was a "hostile work environment" for women.

***Harassment continues after Board learns of harassment and fails to prevent or correct it.***

97. In late 2023, Ms. Sabio learned that on August 31, 2023, Captain II Leon Adams made a sarcastic comment, referencing the letter submitted by female employees regarding sex discrimination. He said words to the effect of, "Oh, we can't say that no more. You see the article and info out in the news?" He continued by expressing anger that his name had been associated with prior allegations, stating that the allegations "weren't true," but that "that's all people will see." Captain II Adams then stated, "I'm going to bring up all the stuff done/said towards the African American employees," and followed by threatening to "give names of every female [who] messed around or slept with other firefighters."

98. Recognizing the seriousness of the comments, Captain Pardiny encouraged the firefighter who heard the comments to speak with her captain, who was also present for the comment, and requested that the matter be formally reported. When the captain failed to take any action, Ms. Pardiny independently followed up by reporting the incident herself on the firefighter's behalf.

99. The remarks made by Captain II Adams were retaliatory, unprofessional, and indicative of the toxic culture of intimidation that persists within the Department toward women

who speak out.

100. Captain II Adams received no discipline.

101. Ms. Sabio did not feel safe working in the Department, and the Department has disregarded her reasonable fears. Firefighters in the Department work a 24-hour shift and therefore regularly sleep at the station. Despite ongoing complaints about their safety, Defendant failed to install locks on the bunk room doors used by the female firefighters. It was only after this dangerous situation was highlighted in writing in the August 13, 2023 letter, that the Department installed locks on some of the women's bunkroom doors.

102. It took a full two months after receiving the written letter for the County to install any locks. However, basic safety and privacy concerns remain unresolved.

103. For example, at Fire Station 1, two doors still lack functional locks—one to the women's bunkroom and another to the officer's quarters bunkroom. This leaves both areas, where women sleep and change during 24-hour shifts, insecure and accessible to anyone.

104. Captain Cheryl Long, on behalf of female firefighters and officers, raised concerns about the lack of security in these spaces. The Department has failed to take corrective action.

105. Defendant created a hostile work environment by ignoring Ms. Sabio's safety concerns and doing nothing to identify the anonymous emailer(s) who spread libelous stories about her personal life and sexually harassed Ms. Sabio and her female co-workers. Despite written promises by Fire Chief Povlitz to thoroughly investigate the identity of the anonymous emailer, no internal investigation has been performed, and no update from the senior leadership on any aspects of the complaints has been provided to this day. Largely as a result of this inaction, the Local 2800 union members, of which Ms. Sabio is a member, recorded a "Vote of

No Confidence" in the Fire Chief in December 2023. In response to the vote, the County Manager expressed his full support for Chief Povlitz and has not called for his resignation.

106. The Department has further denied Ms. Sabio request for reasonable accommodation for temporary, light-duty, remote work, which was necessary because the unsafe work environment permitted by the Department triggered Ms. Sabio's PTSD.

107. From August 2023 to November 2023, Ms. Sabio took leave to protect herself from her unknown stalker and whatever manager told him that she complained about his misogynistic emails. By the end of November, Sabio was low on leave and had to return to the field.

108. From November 2023 – June 2024, Ms. Sabio worked in the field without knowing who was stalking her and sending her harassing emails. She did not know if it was one

109. of her coworkers, or even a supervisor. Ms. Sabio was terrified. When her anxiety was too much to bear, she took leave.

110. By June 2024, Ms. Sabio had run out of sick leave. She knew that she could not bear to work under the scrutiny of an unknown stalker without at least the option of taking a sick day. Thus, because the Department failed to give her another assignment or to otherwise prevent, correct, or protect her from dangerous and threatening harassment on the job, Ms. Sabio retired on June 5, 2024.

## CLAIMS

### COUNT I –Sex-Based Hostile Work Environment

111. Defendant Arlington County Board of Supervisors has subjected Ms. Sabio to adverse treatment because of her sex, including failing to prevent, correct, and protect her from, sex-based stalking, in violation of Title VII of the Civil Rights Act of 1964, as amended.

112. As a result of Defendant Arlington County Board of Supervisors' discriminatory treatment of her, Ms. Sabio suffered a constructive discharge and continues to suffer loss of pay, career damage, physical pain, emotional distress, and mental anguish.

### COUNT II –Denial of Reasonable Accommodation

113. Defendant Arlington County Board of Supervisors denied Ms. Sabio's reasonable accommodation request, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq, as amended.

114. As a result of Defendant Arlington County Board of Supervisors' failure to accommodate her, Ms. Sabio suffered a constructive discharge and continued to suffer loss of pay, career damage, physical pain, emotional distress, and mental anguish.

### COUNT III – Retaliation for Requests for Reasonable Accommodation

115. Defendant Arlington County subjected Ms. Sabio to adverse treatment, including denying her request for remote work, in retaliation for her requests for reasonable accommodation, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq, as amended.

116. As a result of Defendant Arlington County's retaliatory treatment of her, Ms. Sabio suffered constructive discharge, loss of pay, career damage, physical pain, emotional

distress, and mental anguish.

**COUNT IV – Retaliation for Complaints of Sex Discrimination**

117. Defendant Arlington County subjected Ms. Sabio to adverse treatment, including denying her request for remote work, in retaliation for her complaints and reports of sex discriminatory emails, in violation of Title VII of the Civil Rights Act.

118. As a result of Defendant Arlington County Board of Supervisors' retaliatory treatment of her, Ms. Sabio suffered constructive discharge, loss of pay, career damage, physical pain, emotional distress, and mental anguish.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court enters judgment in her favor and against Defendants on all claims brought herein and provides her with the following relief:

a. award Plaintiff $300,000 compensatory damages against Defendants, plus interest.

b. award Plaintiff the costs of bringing and maintaining this civil action and the investigation that preceded it, including reasonable attorneys' fees and costs.

c. award Plaintiff such other and further relief as the interests of justice may require.

d. order Defendant Arlington County Board of Supervisors to correct Plaintiff's personnel file to remove all disciplinary records and memoranda; and

e. enjoin Defendants from discriminating or retaliating against plaintiff in the future.

**JURY DEMAND**

Plaintiff hereby requests a jury trial on all issues of fact and damages.

Date: August 6, 2025

Respectfully submitted,

*/s/ Ellen K. Renaud*
Ellen K. Renaud (VA # 47326)
Law Offices of Ellen K. Renaud
7839 Seth Hampton Drive
Alexandria, VA 22315
(301) 908-6060
Ellen@RenaudLawyers.com

*Counsel for Plaintiff*